ATLAS TACK CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 4725.   Promulgated January 16, 1928.

*W. E. Hayes, Esq.*, and *Myron Heller, Esq.*, for the petitioner.
*F. O. Graves, Esq.*, for the respondent.

OPINION.

PHILLIPS: The petitioner assigns as its first error the refusal of the Commissioner, in computing the actual cash value of property acquired for stock at organization for invested capital purposes, to allow any separate value for the intangible assets. The books of account of the predecessor corporation were no longer in existence at the time of the hearing and because of this and the lapse of time, the evidence as to what happened is necessarily incomplete. It appears that the predecessor corporation, the Atlas Tack Co. of Maine, was a consolidation of several companies manufacturing tacks and nails used in the shoe-manufacturing and shoe-repairing industry, as well as other articles. It had acquired from these companies labels and trade-names which had been in use for many years and which had an established reputation and market. Some time prior to 1897 this predecessor company had been in the hands of a receiver but was discharged from receivership in 1897. From that date to the organization of the petitioner on July 1, 1900, the earnings of the company had barely exceeded its losses.

The record further discloses that the assets were acquired by the petitioner from one H. H. Rogers through a nominee. They had been acquired by Rogers, presumably, through a sale in foreclosure. The price paid by Rogers is not shown. There is in the record a closing balance sheet of the old company which discloses a second mortgage of $100,000, and since the assets were acquired by the petitioner subject only to a first mortgage, the reasonable presumption is that the company was unable to care for either the principal or interest upon its second mortgage and that it was under this mortgage that a foreclosure sale took place. The record discloses that during the first six months after its organization the petitioner had substantial sales which continued to increase from year to year. It further appears that approximately 40 per cent of the sales were made under the trade-names and labels acquired at organization and that by reason of the reputation and market for such labeled goods the petitioner was able to obtain a somewhat better price than that at which its competitors could sell similar goods. During the first six months of operation it sustained a considerable loss. During the following three years it had modest profits. Thereafter, its profits were substantial.

On this showing we are asked to find that the Commissioner committed error in refusing to allow any separate value for trademarks, trade-names, and labels.

We believe that it will not be disputed that unless a business such as that which the petitioner acquired has some value as a going concern, its tangible assets such as machinery, equipment, merchandise inventory, and goods in process of manufacture can not be disposed of except at a sacrifice. Sound business judgment dictates that if one is to purchase the assets of a business which has not shown a profit in the past and is to pay therefor an amount which represents substantially the full value of its tangible assets as an operating business, he must be reasonably certain that the business, properly managed, will show profits justifying the price paid. It appears that in the present instance the Commissioner has allowed the tangible assets acquired at organization for stock to be included in invested capital at their value to a successfully operating business. In so doing he has given effect to that intangible value of an operating concern which marks the difference between a sale of its assets at full value and a sale at a liquidating value. He has assumed that there went with these tangible assets sufficient intangible value to make them worth the value which he has placed upon them. In the present instance this intangible value included an established market, and certain trade-marks, trade-names, and labels which were well known. Viewing the record as a

whole and attempting to visualize the situation as it existed in July, 1900, we would not be justified in finding that the intangible assets acquired by the petitioner had at that time any value in excess of that allowed indirectly by the Commissioner. By this we do not mean that these trade-names, trade-marks, and labels had no value at that time. Undoubtedly they did have some substantial value and conceivably might have been sold to a competitor for some price, but here we must look to a transaction where the petitioner acquired a very large amount of tangible assets which, without these intangibles, would have had little or no value and where the stock of the company was issued for all of the assets of an operating business, both tangible and intangible. The record justified no separate valuation of the intangible assets and we approve the action of the Commissioner.

The petitioner alleges error in computing the depreciation upon its power plant and upon its machinery and equipment. It appears that in 1919 the power plant was in full operation 20 hours per day. Its plant appears also to have been to some degree obsolescent for in 1922 petitioner abandoned the operation of its power plant and purchased its power from outside sources, finding this cheaper than either continuing the operation of its plant or remodeling to meet new conditions. Under the circumstances, we believe the petitioner is entitled to a 10 per cent rate of depreciation in the taxable year.

Upon its machinery and equipment petitioner claims a rate of 25 per cent, basing its claim upon a normal rate of 10 per cent for normal years with an additional 15 per cent because of overtime operation. It appears that beginning with the year 1916, the petitioner had operated a substantial part of its plant on a 24-hour basis. If the petitioner's claim for 25 per cent is justified in 1919, a like rate is justified for the three preceding years. The effect of this would be to depreciate the entire machinery account in those four years, but it also appears that substantially all of the machinery which was in the plant in 1911 was still there and in operation in 1919. This fact appears to conclusively dispose of opinion testimony to the effect that 25 per cent was a reasonable rate of depreciation.

Considerable weight is given in the testimony of the witnesses to changes in style making a part of the machinery obsolete. For instance, the petitioner was engaged in the manufacture of eyelet-making machines. High shoes and corsets went out of style and such machinery became useless to a considerable extent. This, however, constituted only a very small portion of the petitioner's business and apparently the allowance made by the Commissioner will be sufficient to care for such obsolete machinery. Considerable weight

was laid upon the rapidity with which such equipment as dies had to be replaced. From the testimony, however, it is fair to assume that all such articles of equipment were charged to expense and therefore play no part in determining the rate of depreciation upon the machinery and equipment as a whole. We are satisfied that the evidence would not justify us in disturbing the determination of the Commissioner.

*Decision will be entered on 10 days' notice, under Rule 50.*